IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 16-225 |
| v. | ) ) | Judge Cathy Bissoon |
| SCOTT MEDICAL HEALTH CENTER, P.C., | ) ) ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Based on the evidence presented at the Hearing on Damages held on October 30, 2017, the Court hereby makes the following findings, which are supported by a preponderance of the evidence:

## I.  FINDINGS OF FACT

1.  Dale Massaro was employed by Defendant Scott Medical Health Center, P.C. as a telemarketer from July 24, 2013 to August 16, 2013.  (Doc. 77, Tr. at 8:5-6, 20:15-21:7).  At the time of his employment, Massaro was known by his unmarried name, Dale Baxley.  (Tr. at 4:18-5:21).

2.  Massaro moved to the Pittsburgh area in July 2013.  (Tr. at 5:22-6:8).

3.  Massaro was excited to move to the Pittsburgh area, because he believed it was an area that would be more accepting of his sexual orientation than the community where he

previously resided, and he had started a new relationship with Anthony Massaro, who lived in the Pittsburgh area. (Tr. at 6:18-7:6, 16:1-5, 23:2-7).[1]

4. Massaro's employment with Defendant was his first job after moving to the Pittsburgh area. (Tr. at 7:17-21).

5. Massaro was paid $11.00 per hour, and was scheduled to work 38 hours per week. (Tr. at 8:12-16; Doc. 75, Employee Details; Doc. 79-2, Exhibit A – Back Pay Calculation).[2]

6. Prior to working for Defendant, Massaro was consistently outgoing and active. He enjoyed spending time with friends. (Tr. at 15:9-18, 15:22-25, 24:9-12, 25:2-5).

7. Prior to working for Defendant, Massaro had lost a significant amount of weight following lap-band surgery and weighed about 180 pounds when he started his telemarketing job. (Tr. at 15:9-14, 28:16-21).

8. Almost immediately after starting work with Defendant, Massaro was subjected to sex-based harassment in the form of anti-gay slurs and comments directed at him by his supervisor, Robert McClendon, including being repeatedly referred to as "faggot" and having to endure offensive questioning about his sex life and relationships. (Tr. at 8:7-9, 8:22-9:15).

9. Massaro reported the harassment to Gary T. Hieronimus, Defendant's owner and chief executive officer, but Hieronimus refused to take action to stop the harassment, instead stating that McClendon "was just doing his job." (Tr. at 9:25-10:2, 11:23-12:11, 35:22-36:1).

10. After his report to Hieronimus, the harassment continued, and consequently Massaro decided to quit his job. (Tr. at 12:19-13:12).

---

[1] Unless otherwise indicated, Dale Massaro is referred to herein as "Massaro" and Anthony Massaro is referred to herein by his full name, "Anthony Massaro."
[2] The payroll records show that Dale Massaro took half-hour unpaid breaks when he worked Monday through Thursday.

11. As a consequence of the harassment he endured while employed by Defendant, Massaro became frustrated and distraught about the harassment, to the point of often crying. (Tr. at 25:22-26:1, 33:13-21).

12. As a consequence of the harassment he endured while employed by Defendant, Massaro became irritable, lashing out at his then-boyfriend, Anthony Massaro. Massaro also stopped socializing with friends. (Tr. at 17:11-18, 26:11-19, 30:5-10, 30:17-24).

13. As a consequence of the harassment he endured while employed by Defendant, Massaro began overeating, gaining as much as fifteen (15) pounds in a few weeks. (Tr. at 27:22, 28:2-7).

14. As a consequence of the harassment he endured and being forced to resign his employment, Massaro felt depressed. (Tr. at 16:6-9). After Massaro resigned his position, he isolated himself from family and friends, and experienced changes to his sleeping habits. (Tr. at 16:16-25, 27:1-6, 29:20-30:4, 34:17-24). He felt like he was not himself anymore, felt abused and unfairly treated, and hated himself. (Tr. at 16:11-15).

15. Massaro's feelings of depression and other emotional distress resulting from the harassment and loss of employment also manifested themselves as adverse changes in his appearance and personal habits, such as his manner of dress and personal hygiene. (Tr. at 24:7-17; 26:11-25, 28:22-29:6, 29:10-16). Additionally, in the six months after his resignation, Massaro also experienced a substantial weight gain resulting from overeating caused by his emotional distress. (Tr. at 17:1-10, 27:7-28:15, 34:17-24).

16. Massaro's depression and irritability caused by the harassment and job loss also negatively affected his relationship with his future spouse, Anthony Massaro, to the point that

they briefly ended their relationship between December 2013 and January 2014. (Tr. at 17:11-18, 30:17-24).

17. In late 2013, Massaro started receiving counseling for his depression through an employee assistance program (EAP). He spoke with an EAP counselor by phone once or twice a week for a couple of months. (Tr. at 17:19-18:2, 18:10-20).

18. Massaro also received medical treatment for his emotional distress from his family physician, Dr. Berge, which included a prescription for Lexapro, an anti-depressant, and Ativan, a medication for sleep issues.[3] (Tr. at 18:21-19:3). Massaro recalls receiving those prescriptions in early 2014. (Tr. at 19:19-20:2). He had never been prescribed such medications before, nor had he been treated for depression or anxiety before. (Tr. at 19:19-20:14 34:10-16).

19. Other than the harassment he suffered while working at Defendant, there was nothing else occurring in Massaro's life to explain his depression and other emotional distress. (Tr. at 19:4-9; 34:25-35:3).

20. After leaving Defendant's employ on August 16, 2013, Massaro was unemployed until he started a job working with people with intellectual disabilities with PA Mentor on September 15, 2013, where he earned $10.25 per hour. He remained employed with PA Mentor through January 2016. (Tr. at 13:13-14:8).

21. Massaro began working for Mainstay Life Services on December 1, 2015, again working with people with intellectual disabilities, earning $11.50 per hour. (Tr. at 14:12-20).

22. Defendant, through its owner and chief executive officer Gary T. Hieronimus, was at all relevant times aware that sex-based harassment was unlawful. (Tr. at 39:7-18).

---

[3] The transcript misspells the physician's name as "Berkey."

23. Indeed, Defendant's anti-harassment policies in effect at the time of Massaro's employment stated that harassment because of sexual orientation was unlawful. (Tr. at 37:17-39:6, 39:20-42:3).

24. Although Defendant had an anti-harassment policy, Massaro was never trained on the policy, and was not permitted to read or have a copy of the policy. (Tr. at 10:11-11:11; Ex. A).

25. Robert McClendon, as the manager of the telemarketing department, was responsible for hiring and training employees in his department. (Tr. at 42:4-10, 43:1-16).

26. Hieronimus did not train Robert McClendon on Defendant's anti-harassment policy and could not identify anyone who would have provided such training. (Tr. at 42:16-24).

27. Defendant did not assert a "good faith" defense pursuant to *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999). (Doc. 50, Defendant's Answer).

28. At all relevant times, Defendant has employed less than 101 employees. (Defendant's Answer at ¶4 (admitting that it employed at least 15 employees); Tr. at 36:19-37:15).

29. The Court entered a default judgment on liability against Defendant and in favor of Plaintiff, the U.S. Equal Employment Opportunity Commission ("EEOC"), on September 25, 2017. (Doc. 72).

## II. CONCLUSIONS OF LAW

**Back Pay and Prejudgment Interest**

I. Title VII authorizes back pay relief to victims of discrimination. 42 U.S.C. §2000e-5(g) (establishing entitlement to back pay less "[i]nterim earnings or amounts earnable with reasonable diligence by the person or person discriminated against"). In determining a back

pay award, a district court has wide latitude to "locate 'a just result'" for the purpose of effectuating the "make whole remedy of Title VII in light of the circumstances of a particular case." *Taxman v. Board of Educ.*, 91 F.3d 1547, 1565 (3d Cir. 1996) (quoting *Albermarle*). There is a strong presumption in favor of back pay awards where discrimination has been found. *Albermarle*, 422 U.S. at 421 n.12. As such, back pay should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.*

II. Prejudgment interest on back pay awards is appropriate to ensure that victims of discrimination are made whole. *West Virginia v. United States*, 479 U.S. 305, 311 n.2 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress."). Prejudgment interest "serves to compensate a plaintiff for the loss of the use of money that the plaintiff otherwise would have earned had he not been unjustly discharged." *Booker v. Taylor Milk Co.*, 64 F.3d 860, 868 (3d Cir. 1995); *see also Arco Pipeline Co. v. SS Trade Star*, 693 F.2d 280, 281 (3d Cir. 1982) ("The purpose of prejudgment interest is to reimburse the claimant for the loss of the use of its investment or its funds from the time of the loss until judgment is entered."). The Third Circuit has acknowledged that "[a]s with the back pay award, prejudgment interest helps to make victims of discrimination whole." *Booker*, 64 F.3d at 868. Use of the adjusted prime rate, pursuant to 26 U.S.C. §6621, is appropriate in calculating prejudgment interest on back pay awards. *Taxman*, 91 F.3d at 1566.

3. The Court finds that EEOC, has proven by preponderance of the evidence that Dale Massaro is entitled to a back pay award. The Court adopts EEOC's back pay calculation,

submitted at trial, which includes prejudgment interest using the adjusted prime rate. The Court therefore awards Massaro back pay in the amount of $5,500.43.

**Compensatory Damages**

4.  Compensatory damages are recoverable from a covered entity that has committed intentional discrimination in violation of Title VII, such as sex harassment and constructive discharge. 42 U.S.C. §1981a(a)(2). The compensatory damages available include recovery for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). A discrimination victim's testimony may be sufficient, standing alone, to justify an award of compensatory damages. *See Shesko v. Coatesville*, 324 F. Supp. 2d 643, 652 (E.D. Pa. 2004) (denying motion for remittitur of a compensatory damages award, holding that plaintiff's own testimony about her sadness and depression, and the difficulty of seeing another person promoted to the position she wanted, was sufficient to support the award).

5.  By operation of 42 U.S.C. §1981a(b)(3), non-pecuniary compensatory and/or punitive damages available for violations of Title VII are subject to a maximum limit on awards, depending on the number of employees. Defendant at all relevant times had fewer than 101 employees, therefore the applicable statutory limit on compensatory and/or punitive damages is $50,000.00. 42 U.S.C. §1981a(b)(3)(A).

6.  The Court finds that EEOC has proven by a preponderance of the evidence that Massaro is entitled to an award of non-pecuniary compensatory damages. The witness testimony in this matter demonstrates that Massaro sustained significant emotional distress caused by McClendon's severe harassment of Massaro and his resulting loss of employment (constructive

discharge), including depression, anxiety, social isolation, changes to his sleeping patterns, and significant weight gain.

      7.      Based on the aforementioned facts, the Court finds that EEOC has proven that Massaro sustained compensatory damages in excess of the $50,000.00 statutory damages limit set forth at 42 U.S.C. §1981a(b)(3)(A). Although an award above $50,000.00 would be consistent with other cases where comparable emotional distress was found, *see, e.g.*, *Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 137 (3d Cir. 2007) (upholding $200,000 emotional distress award in Title VII retaliation case, where plaintiff and his wife testified about his emotional distress, including difficulty sleeping, weight loss, and social isolation); *Gagliardo v. Connaught Labs.*, 311 F.3d 565, 573-74 (3d Cir. 2002) (in disability discrimination case brought under both federal and state law, upholding $2 million compensatory damages award for plaintiff with multiple sclerosis who presented testimony that her discharge transformed her from a happy and confident person to one who was withdrawn and indecisive); *Tureaud v. Grambling State Univ.*, 294 Fed. App'x 909, 916, 2008 WL 4411438, at *7 (5th Cir. 2008) (holding $140,000 compensatory award in Title VII discharge case not excessive; plaintiff testified to weight gain and feeling depressed and humiliated); *Hall v. Pa. Dep't of Corrections*, No. 3V-02-1255, 2006 WL 2772551, at *20-23 (M.D. Pa. Sep. 25, 2006) ($75,000 compensatory award, reduced from $300,000, where sole damages evidence was plaintiff's testimony that she felt "embarrassed" by verbal harassment, but continued working; no evidence of need for counseling or other treatment or that plaintiff's relationships had been affected by hostile work environment); *see also Bolden v. SEPTA*, 21 F.3d 29, 33-34 (3d Cir. 1994) (affirming award of $250,000 for compensatory damages in a Section 1983 claim, where the plaintiff, his wife and daughter testified about how he had changed after being discharged following an unconstitutional drug test), in conformity

with the maximum award authorized by statute, the Court cannot award more than $50,000.00 in compensatory damages.

**Punitive Damages**

8. Punitive damages may be awarded upon a showing that the covered entity has "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. §1981a(b)(1). "The employer's conduct need not be independently 'egregious' to satisfy §1981a's requirements for a punitive damages award, although evidence of egregious misconduct may be used to meet the plaintiff's burden of proof." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 546 (1999). An employer may be vicariously liable for the discrimination of its employee if the employee was serving in a "managerial capacity" and committed the wrong while "acting in the scope of his employment." *Id.* at 542-44, 45.

9. The Court finds that EEOC has proven by a preponderance of the evidence that Massaro is entitled to an award of punitive damages. The uncontroverted evidence shows that Defendant was aware that federal law prohibited sex-based harassment. McClendon was the telemarketing manager, responsible for hiring as well as training the employees in his department. The uncontroverted evidence also shows that Defendant ignored Massaro's report of harassment, and instead, through its chief executive officer, stated that the harasser was "just doing his job." In other words, Defendant, acting through an alter ego or proxy of the corporation, tolerated and ratified the Title VII violation in this case, affirmatively allowing a manager to create and perpetuate a sexually hostile working environment in the face of its obligation to prevent and correct such an environment.

10. An employer may establish an affirmative defense to punitive damages by

proving that a managerial employee's discriminatory conduct was contrary to the employer's good faith efforts to comply with Title VII's prohibitions. *See Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000) ("The defendant . . . is responsible for showing good faith efforts to comply with the requirements of Title VII"); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001) (referring to the defense as an affirmative defense that "requires an employer to establish both that it had an antidiscrimination policy and made good faith effort to enforce it"). However, in its Answer, Defendant failed to plead the "good faith efforts" affirmative defense to punitive damages, *see* Defendant's Answer (Doc. 50), and that defense was therefore waived, *e.g.*, Fed. R. Civ. P. 8(c)(1). Defendant has not presented any evidence to support such a defense.

11.     Furthermore, the uncontested evidence presented by EEOC, which this Court credits, demonstrates that Defendant did not, in fact, make good faith efforts to comply with Title VII. To the contrary, EEOC's evidence shows that Defendant, acting through its owner and CEO Hieronimus, not only failed to take corrective action in response to Massaro's complaint of a sexually hostile work environment, but actually *ratified* the harasser's conduct and intentionally permitted the harassment to persist, resulting in Massaro's constructive discharge. The good faith efforts defense to punitive damages is unavailable for discriminatory acts committed by company officials who are of sufficient authority within the organization that they are deemed alter egos or proxies of the organization under agency principles, such as owners or corporate officers. *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 516 (9th Cir. 2000) (employees with positions sufficiently high up in the company are considered proxies and thus prevent the company from asserting a vicarious liability defense to punitive damages); *see also Hightower v. Roman, Inc.*, 190 F. Supp. 2d 740, 753-54 (D.N.J.

2002) (denying summary judgment where issue of fact remained about alleged harasser's role in the company and whether he was sufficiently senior to be a proxy).  Additionally, Massaro testified that he was not informed of the contents of Defendant's anti-harassment policy, never received a copy, and was never trained about harassment in the workplace.  Hieronimus placed McClendon, the telemarketing manager, in charge of informing employees in his department of the company's policies, yet was unaware of whether McClendon had received training on those policies, and did not train McClendon himself.

12.     The Court therefore finds that EEOC has proven by a preponderance of the evidence entitlement to an award of punitive damages.  Some relevant factors to consider in determining the amount of punitive damages that should be awarded include: 1) whether the defendant employer should be punished for the conduct; 2) whether punitive damages are necessary to deter future similar wrongful conduct by the defendant; 3) whether an award of punitive damages will deter others from engaging in similar wrongful conduct; 4) the degree to which a defendant should be punished, or the degree to which a punitive damages award will act as a deterrent; and 5) the financial resources of the defendant.  *See, e.g.,* Third Circuit Model Jury Instructions For Employment Discrimination Claims Under Title VII, Instruction 5.4.2 – Punitive Damages (last updated March 2017).

13.     Applying the aforementioned factors, the Court finds that punitive damages in the amount of $75,000.00 would be warranted by the evidence.  The discrimination for which Defendant has been found liable was intentional and egregious and warrants punishment.  Furthermore, to the best of this Court's knowledge, Defendant's business operations are ongoing, and its discriminatory conduct proven by EEOC must be deterred in the future for the protection of Defendant's current and future workforce.  Defendant's discriminatory conduct that was

established by EEOC included not only the sex harassment committed by McClendon but also Hieronimus's ratification of that harassing conduct, actions that reflect a substantial deviation from the requirements of Title VII. Given that Hieronimus remains the owner and CEO of Defendant, there also remains a significant risk of future violations of Title VII that must be deterred. A punitive damages award in the amount identified is likely to serve as a substantial deterrent to Defendant and other employers from engaging in similar violations of Title VII in the future. While the EEOC has not presented evidence of the financial resources of Defendant, the Court is aware that Defendant has filed a Chapter 11 bankruptcy petition, a factor that the Court has considered; however, the fact of potential insolvency or limited resources does not, by itself, immunize an employer from punitive damages, particularly in view of the important Title VII objective of general deterrence of other employers from engaging in similar violations of law.

14. Notwithstanding the view of the Court that $75,000 would be an appropriate punitive damages award in this case, by operation of the statutory damages cap the aggregate amount awarded for compensatory damages for emotional distress and punitive damages combined cannot exceed $50,000.00. 42 U.S.C. § 1981a(b)(3).

**Injunctive Relief**

15. The standard for awarding injunctive relief is set out clearly in Title VII:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1). In *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), the

Supreme Court held that Section 706(g)(1) not only permits the issuance of injunctions, but in fact imposes upon district courts a "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Id.* at 418 (emphasis added).[4]  The Court of Appeals for the Third Circuit has recognized this duty to issue appropriate injunctive relief in order to advance the twin goals of Title VII, remediation and prevention.  *See Mardell v. Harleysville Life Insurance Co.*, 31 F.3d 1221, 1238-39 (3d Cir. 1994), *amended on other grounds*, 65 F.3d 1072 (3d Cir. 1995).

      16.     It is not necessary for a plaintiff to prove ongoing discrimination, or a pattern or practice of discrimination, to justify injunctive relief.  *See EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 468 (6th Cir. 1999) ("It is clear that the EEOC may obtain relief that protects a class of persons from unlawful employment discrimination without citing numerous instances of such discrimination.  While the right to such relief is not absolute, and the power to order it rests in the hands of the lower courts, the EEOC may seek it upon proof even of just one instance of discrimination that violates Title VII.  In exercising its discretion to determine the extent of injunctive relief warranted the district court must be guided by the purposes of Title VII, a primary purpose being prophylaxis, i.e., deterrence of future violations of law.  *See, e.g., North Hudson Regional Fire & Rescue*, 665 F.3d at 86; *Evans v. Harnett Cty. Bd. of Educ.*, 684 F.2d

---

[4] In *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), the Supreme Court articulated a familiar four-factor test to determine permanent injunctive relief, which in that case involved injunctive relief for violations of the Patent Act: (1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Id.* at 291.  These factors inform the Court's discretion, though as the Supreme Court earlier instructed in *Albemarle Paper*, they are to be applied with due regard to the affirmative duty of the district court to enter a decree that eradicates present effects of past discrimination and prevents future violations of Title VII.

304, 306 (4th Cir. 1982) (citing *Albemarle Paper*, holding district court erred by not enjoining unlawful practices, and stating, "[Plaintiff] and other black applicants are entitled to be considered for future appointments free of the taint of the invidious discrimination that the district court found"); *EEOC v. Conn-X, LLC*, Civil Case No. L-09-2881, 2012 WL 456870, at *1-2 (D. Md., Feb. 9, 2012) (citing preventive purpose of Title VII and the public interest in preventing future discrimination, enjoining defendant from any further religious harassment or discrimination though victims no longer employed).

18. To avoid injunctive relief after a finding of a Title VII violation, the burden is on the employer to demonstrate that the type of violation at issue is unlikely to recur under the circumstances. *See, e.g.*, *EEOC v. Service Temps, Inc.*, 679 F.3d 323, 338 (5th Cir. 2012) (holding injunction presumptively appropriate upon finding Title VII violation and disregarding defendant's argument that EEOC failed to adduce evidence showing need for injunction); *EEOC v. Goodyear Aerospace Corporation*, 813 F.2d 1539, 1544-1545 (9th Cir. 1987) ("If the EEOC proves its case, and [the defendant] fails to prove the violation will likely not recur, the EEOC will be entitled to an injunction); *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1253-54 (11th Cir. 1997) (reversing district court denial of injunction as abuse of discretion and remanding case to enable court to grant such relief unless it "finds persuasive reasons to deny particular items of relief").

19. Upon a finding that an injunction is warranted, the terms of that injunction should be formulated so as to be no broader or more burdensome than are necessary to achieve its objectives and secure complete relief. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 279-80 (1977).

20.    The Court finds that EEOC has proven that an injunction against Defendant is warranted in this case. The likelihood of future violations may be inferred from past unlawful conduct, *see, e.g.*, *United States v. Rx Depot, Inc.*, 290 F. Supp.2d 1238, 1247 (N.D. Okla. 2003) (citing authorities). Defendant committed an intentional violation of Title VII by subjecting Massaro to a hostile work environment because of his sex and constructively discharging him as a result of its refusal to take action to stop the harassment and correct its work environment.

21.    Furthermore, an injunction is warranted where individuals who were involved in the discrimination (whether through direct participation in the unlawful conduct or by condoning or tolerating the conduct) remain employed by the defendant and in positions of authority. *See, e.g.*, *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1996) (affirming injunction where decision-makers regarding unlawful denial of religious accommodation remained primary decision-makers regarding accommodations); *Bundy v. Jackson*, 641 F.2d 934, 946 n.13 (D.C. Cir. 1981) (reversing denial of injunctive relief in a sexual harassment case in part on the grounds that the individuals who perpetrated the violations remained employed); *EEOC v. Red River Beverage Co.*, No. Civ. A. 3:99-CV-1685, 2003 WL 21317861, at *1 (N.D. Tex., Mar. 7, 2003) (noting manager who terminated aggrieved person remained employed and was promoted by defendant; ordering three-year injunction); *Sherman v. Kasotakis*, 314 F. Supp. 2d 843, 879 (N.D. Iowa 2004) (issuing permanent injunction in Title II public accommodations case, where plaintiffs were subjected to racist statements by restaurant server, server was known to make such statements in the past, supervisor took no action, and defendant took unyielding position at trial that its actions were reasonable, all evidence to the contrary); *Sanchez v. Miami Beach*, 720 F. Supp. 974, 982 (S.D. Fla. 1989) (issuing permanent injunction in favor of plaintiff female police officer in sexual harassment case, where current police officers testified at trial that they

believed objectively offensive pictures and posters were just "jokes," and defendant city implicitly condoned the conduct by taking no disciplinary action against the perpetrators). *See also EEOC v. KarenKim, Inc.*, 698 F.3d 92, 100-01 (2d Cir. 2012) (holding district court abused discretion by not issuing injunction barring defendant from reemploying terminated harasser and barring defendant from allowing him on premises; noting continuing ability of harasser to have access to store). In this case, the testimony demonstrates that Gary Hieronimus, Defendant's owner and chief executive officer, not only tolerated but in fact *ratified* the violations of Title VII in this case, and Hieronimus remains the owner and chief executive of Defendant, thus presenting a significant risk of recurring violations of the type at issue in this case.

22. Finally, there is no evidence that Defendant has subsequently undertaken any training, policies or programs geared specifically to preventing the violations that occurred in this case from recurring. An injunction is warranted in such circumstances. *See, e.g.*, *Bundy v. Jackson*, 641 F.2d 934, 946, n.13 (D.C. Cir. 1981) (reversing denial of injunctive relief in a sexual harassment case on the grounds the evidence showed that the employer had demonstrated no action taken to prevent recurrence of the Title VII violations).

\* \* \*

Based on the foregoing, the Court finds that Plaintiff has demonstrated its entitlement to back pay, compensatory and punitive damages on behalf of Mr. Massaro, as well as to injunctive relief. An appropriate Judgment Order will follow.

November 16, 2017                              s\Cathy Bissoon
                                               Cathy Bissoon
                                               United States District Judge

cc (via ECF email notification):
All counsel of record